**AMERICAN NETWORK, INC., Plaintiff,**

v.

**ACCESS AMERICA/CONNECT ATLANTA, INC.,
Defendant.**

**No. 96 Civ. 6823(LLS).**

United States District Court,
S.D. New York.

Aug. 14, 1997.

Thomas M. Furth, Levisohn, Lerner, Berger & Langsam, New York City, for Plaintiff.

## OPINION AND ORDER

STANTON, District Judge.

American Network, Inc. ("ANI"), a New York corporation that provides services allowing computer users to gain access to the Internet, asserts claims of trademark infringement and unfair competition against Access America / Connect Atlanta, Inc. ("Access"), a Georgia corporation that provides similar services. ANI claims that a mark used by Access, "America.Net", infringes a mark ANI owns, "American.Net".

Defendant moves pursuant to Federal Rule of Civil Procedure 12(b)(2) to dismiss the complaint for lack of personal jurisdiction, and in the alternative moves pursuant to 28 U.S.C. § 1404(a) to transfer this action to the Northern District of Georgia.

## BACKGROUND

As both parties have presented matters outside the pleadings to the court and neither suggests that it requires further discovery to respond to the materials presented, this motion is treated as a motion for summary judgment with respect to the jurisdictional issue. *See Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 83 (1st Cir.1997). The undisputed facts are as follows, viewed in the light most favorable to plaintiff. *See Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert. denied*, 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990).

Defendant has its only office and all of its business facilities in Alpharetta, Georgia, and all of its employees are Georgia residents. It owns no property in New York. Its "server," which is the computer equipment it uses to provide its customers with access to the Internet,[1] is located in Georgia.

Defendant uses its server to maintain a site on the World Wide Web ("the Web")[2] and publish documents there. Computer users may visit defendant's site by directly dialing the telephone number for that site or by connecting to it through the Internet.[3]

When a computer user visits defendant's site, the document that initially appears on the user's computer screen is the "home page." (Charugundla Aff., Ex. B.) At the top of that page is the word "america.net" in large letters. Below, in smaller type, the page shows defendant's Georgia mailing address and describes how to browse through other "pages" or documents stored at defendant's site and how to return from those pages to the home page.

The home page states that "There are several divisions of America.Net". (*Id.*) One division, Connect Atlanta, "markets and sells Internet products and services to the Atlanta area communities." (*Id.*) Another division, "IBC Affiliates," is "in the business of helping people across the U.S. to get into the

---

1. The Internet is an international computer network. *See generally American Civil Liberties Union v. Reno*, 929 F.Supp. 824 (E.D.Pa.1996) (describing the Internet), *aff'd*, —— U.S. ——, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997).

2. The World Wide Web is a group of documents electronically stored in different computers all over the Internet. A "site" is a group of documents stored together at one location or "address" on the Web. A computer user with access to a Web site can view documents that are "published" or made publicly available at the site. When a computer user "visits" or connects to a site on a server, the server transmits information to the user's computer, and the user may then view on his or her computer screen the transmitted information, usually in the form of a document or image. See Reno, 929 F.Supp. at 830–38.

3. Computer users may connect to a Web site by using a service to search through Web sites for a particular word or phrase. *Reno*, 929 F.Supp. at 837. For example, if a computer user directed a service to search for the words "Access America" on the Web, the service might locate defendant's site.

Internet Access Provider business. We are a wholesaler of Internet products and services which allow entrepreneurs to focus on sales and marketing in their communities." (*Id.*) Another division, "Internet Services," provides "18 hour by 7 day a week technical support to our local customers and to our IBC Affiliates across the U.S." (*Id.*) The home page mentions two other divisions, "Programming Development" and "Network Operations," neither of which is described as offering services to outside customers.

Defendant's home page displays a "hyperlink" to a page provided by defendant's sales department. By selecting that hyperlink, the computer user can view on his or her screen defendant's service agreement, which states that it "is printed on paper and is included with every package of client software delivered to America.Net customers. By opening the client software disk packaging, each customer agrees to this agreement." (Cohen Aff., Ex. A.) The agreement states that all of defendant's subscribers must enter into the agreement to use defendant's services.

Defendant claims that it has 7500 subscribers worldwide but only six in New York. It claims that those New York subscribers constitute only 0.08% of its customer base and contribute only $150 per month out of its monthly revenue of $195,000. Defendant does not state whether those subscribers are customers of the Connect Atlanta division, the IBC Affiliates division, or some other division.

Plaintiff ANI has 18,000 customers, including 1500 in New York City, which is where its principal place of business is located. It sells its Internet services under the marks "American Network, Inc." and "American.Net", and owns the mark "American Network, Inc.", which is registered with the United States Patent and Trademark Office.

ANI's president, Kent Charugundla, states that he first heard of defendant in 1994 at an industry trade show where defendant had sent a representative. At the time, defendant was not using the "America.Net" mark. Charugundla gave the representative his business card, which showed plaintiff's "American Network" mark and its New York place of business. Two years later, when Charugundla was at a convention, he saw a poster on which defendant was using the "America.Net" mark. He told one of defendant's executives that use of that mark infringed plaintiff's rights. After receiving a letter from defendant's counsel demanding that plaintiff give up its mark, plaintiff filed this action, asserting that defendant's mark is confusingly similar to plaintiff's and that its use infringes plaintiff's trademark rights under federal and state law.

## *DISCUSSION*

### I. Personal Jurisdiction

Because the federal trademark laws do not give plaintiff the right to nationwide service of process, this court can exercise jurisdiction over a defendant only pursuant to the law of the forum state. *See Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd.,* 647 F.2d 200, 204 (D.C.Cir.1981). Plaintiff relies on New York's long-arm statute, N.Y. CPLR § 302, and asserts that this court can exercise jurisdiction over defendant under subsections (a)(1), (a)(2), and (a)(3)(ii) of that statute. Defendant contends that none of those subsections apply and that the exercise of jurisdiction over it would violate due process.

### A. CPLR § 302(a)(3)(ii)

The New York long-arm statute provides in section 302(a)(3)(ii):

(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

· · ·

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

· · ·

(ii) expects or reasonably should expect the act to have consequences in the state

and derives substantial revenue from interstate or international commerce;....

N.Y. CPLR § 302(a)(3)(ii) (1997).

■ That provision requires plaintiff to show that defendant committed a tortious act outside New York from which plaintiff's claims arise, that plaintiff suffered injury in New York, that defendant should reasonably have foreseen New York consequences from its act, and that defendant derives substantial revenue from international commerce. *See Fantis Foods, Inc. v. Standard Importing Co.,* 49 N.Y.2d 317, 325, 425 N.Y.S.2d 783, 786, 402 N.E.2d 122, 124–25 (1980).

■ Defendant does not dispute that it derives substantial revenue from interstate commerce, that it committed an allegedly tortious act—putting the mark "America.Net" on the pages published at the Web site maintained on its Georgia server—outside New York, or that plaintiff's alleged injury arose from defendant's tortious acts. Defendant argues only that (1) plaintiff did not suffer an injury in New York, and (2) it was not reasonably foreseeable that defendant's acts in Georgia would have New York consequences.

### 1.  Injury in New York

■ Defendant correctly observes that it is not sufficient to satisfy section 302(a)(3) that a plaintiff is located in New York and lost profits there. *See Fantis Foods, Inc. v. Standard Importing Co.,* 49 N.Y.2d 317, 425 N.Y.S.2d 783, 402 N.E.2d 122 (N.Y.1980). However, plaintiff claims to have lost more than profits. It claims that it has been, and will continue to be, harmed in the New York market because New York computer users, who are among plaintiff's potential customers, have viewed the mark "America.Net" on their computer screens in New York when visiting defendant's site and have been confused and deceived by that mark.

Those claims of harm in the New York market are sufficient to satisfy the statute's requirement of injury "within the state." N.Y. CPLR § 302(a)(3)(ii). The New York Court of Appeals has interpreted injury "within the state" to include harm to a business in the New York market through lost sales or lost customers. *Contrast Fantis,* 49 N.Y.2d at 325–27 & n. 3, 425 N.Y.S.2d at 786–87 & n. 3, 402 N.E.2d at 124–25 & n. 3 (New York importer did not suffer injury "within the state" when a nondomiciliary seized a cheese shipment bound for Chicago, because there was no allegation that the importer lost cheese sales in New York) *with Sybron Corp. v. Wetzel,* 46 N.Y.2d 197, 205–06, 413 N.Y.S.2d 127, 131–32, 385 N.E.2d 1055, 1058–60 (1978) (in a suit by a New York corporation for theft of trade secrets against a nonresident former employee and his new nonresident employer, the threatened loss of plaintiff's customers and sales in New York constituted injury "within the state"). Under those cases, the requirement of injury "within the state" is met by plaintiff's claims of harm and threatened harm in the New York market resulting from the confusion and deception of New York computer users.

### 2.  Reasonable expectation of New York consequences

Defendant argues that plaintiff has not alleged facts showing that defendant expected or should reasonably have expected its act to have consequences in New York. *See* N.Y. CPLR § 302(a)(3)(ii).

■ That "foreseeability" requirement " 'relates to forum consequences generally and not to the specific event which produced injury within the state.' " *Fantis,* 49 N.Y.2d at 326 n. 4, 425 N.Y.S.2d at 787 n. 4, 402 N.E.2d at 126 n. 4 (quoting Twelfth Ann. Report of N.Y. Judicial Conference 344 (1967)). In interpreting that requirement, the New York courts have focused on whether there were concrete facts known to the nondomiciliary that should have alerted it that its product would enter the New York market. *Contrast Fantis,* 49 N.Y.2d at 326–27 & n. 4, 425 N.Y.S.2d at 786–87 & n. 4, 402 N.E.2d at 124–25 & n. 4 (it was not reasonably foreseeable to a Greek company that there would be New York consequences when it seized a cheese shipment bound for Chicago where there was "no basis other than sheer speculation" that the cheese importer would lose any New York sales) *with Darienzo v. Wise Shoe Stores, Inc.,* 74 A.D.2d 342, 346, 427 N.Y.S.2d 831,

833 (2d Dept.1980) (nondomiciliary shoe manufacturer should have expected New York consequences from its manufacture of shoes because it was aware that a Tennessee distributor to which its shoes were shipped would distribute them to New York retailers).

It was reasonably foreseeable to defendant that publishing its home page on its Web site, with the offending mark, would have New York consequences. In *Martinez v. American Standard*, 91 A.D.2d 652, 653–54, 457 N.Y.S.2d 97, 98–99 (2d Dept.1982), the Appellate Division ruled that the foreseeability requirement was not satisfied where there were no "tangible manifestations" showing that the nondomiciliary defendant, which supplied parts to another nondomiciliary that manufactured air conditioner units, either should have known where the parts were destined or "was attempting to reach a New York market." 91 A.D.2d at 654, 457 N.Y.S.2d at 99. Here, in contrast, there are tangible manifestations that defendant was attempting to reach a New York market. It stated twice on its home page that it could help customers "across the U.S." It had signed up six New York subscribers. Accordingly, it was not "sheer speculation," *see Fantis*, 49 N.Y.2d at 326–27 & n. 4, 425 N.Y.S.2d at 786–87 & n. 4, 402 N.E.2d at 124–25 & n. 4, but a reasonable inference that its publication of its home page might have New York consequences.

Accordingly, section 302(a)(3)(ii) permits this court to exercise jurisdiction over defendant with respect to plaintiff's claims.

## B. Due Process

Defendant argues that it would violate due process for this court to exercise jurisdiction over it.

A defendant must "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)); *see also Quill Corp. v. North Dakota*, 504 U.S. 298, 312–13, 112 S.Ct. 1904, 1913, 119 L.Ed.2d 91 (1992) (observing that the "minimum contacts" test is "a proxy for notice").

For the exercise of jurisdiction over a defendant to comport with due process, "it is essential in each case that there be some act by which the defendant purposefully avails [itself] of the privilege of conducting activities with the forum state." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). Second, the plaintiff must show either that the defendant's contacts with the forum are continuous and systematic, or that the suit arises out of or is related to those contacts. *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 415–16 & nn. 9–10, 104 S.Ct. 1868, 1872–73 & nn. 9–10, 80 L.Ed.2d 404 (1984). Third, due process requires "that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). Finally, the court may consider other factors in determining whether the exercise of personal jurisdiction comports with due process. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–77, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985).

### 1. Acts showing purposeful availment of the forum

Defendant argues that its publication of a page on the Web, without more, is not an act by which it purposefully avails itself of the privilege of conducting business in New York. That argument has merit. Due process "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World–Wide*, 444 U.S. at 297, 100 S.Ct. at 567; *see also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) (suggesting that "random" or "fortuitous" sales of magazines in a forum would not render a nonresident publisher subject to jurisdiction in that forum). Since it is not clear from the submissions that defendant could publish a page on its

Web site in a way as to make it accessible to users in some jurisdictions but not others, arguably a defendant should not be subject to jurisdiction in New York simply because its home page could be viewed by users there.

However, defendant has additional contacts with New York. It has signed up six New York subscribers to the services advertised on its home page. Since the service agreement published at defendant's site states that parties seeking to subscribe to its services are mailed a software package and a written copy of the agreement, it is a reasonable inference that defendant has mailed software packages and agreements to its New York subscribers. Defendant also receives a total of $150 per month from those subscribers.

Those contacts show defendant's purposeful availment of New York. In sending the agreements and software packages to New York computer users and entering into agreements with those users, defendant purposefully directed activity towards New York. If defendant sought to avoid subjecting itself to suit in New York, it could have chosen not to send those materials there. *See World–Wide,* 444 U.S. at 297, 100 S.Ct. at 567 (a party that purposefully establishes contacts with a state "can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State"). Through its contacts with New York, defendant availed itself of a commercial benefit, since it receives monthly payments from its New York subscribers for the services it provides them. The statements published by defendant on its home page that advertise its ability to aid customers "across the U.S." further support the inference that the New York subscriptions are not random or fortuitous, but are rather the result of defendant's purposeful efforts to avail itself of the benefits of New York as part of a nationwide market.

### 2. Nexus between contacts and suit

Due process also prevents the exercise of jurisdiction over a nonresident unless its con-tacts with the forum are continuous and systematic or the suit arises out of or is related to those contacts. *Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 415–16 & nn. 9–10, 104 S.Ct. 1868, 1872–73 & nn. 9–10, 80 L.Ed.2d 404 (1984). There is a sufficient nexus here between defendant's contacts with its subscribers and plaintiff's claims. The subscriptions are evidence of defendant's effort to market its services in New York. That effort is closely related to the basis of plaintiff's claims, because it is defendant's effort to sell its services under its mark that has allegedly caused the confusion of which the plaintiff complains.

### 3. Reasonable foreseeability

Due process further requires that "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World–Wide,* 444 U.S. at 297, 100 S.Ct. at 567 (where a sale of a product "arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or others").

It was reasonable for defendant to anticipate being haled into New York to defend itself from claims arising from the use of its mark in selling its services, because defendant sold its services there. When defendant published the statements on its home page that it can help customers "across the U.S." and other indications of its aim of serving customers nationwide, it was foreseeable that it might be haled to defend itself in a jurisdiction where those publications were not only seen but where, as here, it actually secured customers and sent them materials, provided services to them, and received payment from them.

Defendant points out that its six New York subscribers provide only a minuscule portion of its total revenue. That does not result from any effort to avoid marketing its services here. Nor is it essential for jurisdictional purposes that defendant's contacts with New York result in substantial revenue.

In cases where Supreme Court has observed that a defendant's efforts to market its products in a forum may make it reasonable to hale it into court there on claims relating to those products, it has not suggested that the exercise of jurisdiction would be reasonable only if the efforts achieved substantial success. *See, e.g., Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 111, 107 S.Ct. 1026, 1031, 94 L.Ed.2d 92 (1987) (O'Connor, J.); *World–Wide,* 444 U.S. at 297, 100 S.Ct. at 567. It is reasonable for a corporation deriving substantial revenue from interstate commerce, like defendant, to anticipate that its efforts to serve a market with a particular product may subject it to suit there on claims, like those here, relating to such efforts, even if those efforts have not resulted in much revenue in that market.

There is another factor that made it reasonable for defendant to anticipate being sued in New York: its alleged awareness of plaintiff's mark and location. Such awareness can be inferred from ANI's president's statement that in 1994 he gave a representative of defendant a business card showing plaintiff's mark and New York place of business. Assuming that defendant indeed knew of plaintiff's mark and New York place of business, it became more reasonable for defendant to assume that publishing its similar mark on its Web page, which could be viewed from anywhere, might cause harm to a New York corporation and that defendant might then be sued there.

### 4. Other factors

There are other factors that the court "may evaluate" in determining whether the assertion of jurisdiction over a party is so unreasonable as to violate due process. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476–77, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). Those factors include the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies. *Id.* Where, as here, it has already been determined that the defendant has minimum contacts with the forum state, the defendant must "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 477, 105 S.Ct. at 2184–85.

Those factors do not compel the conclusion that asserting jurisdiction over defendant would violate due process. While the inconvenience to defendant of litigating in this forum may be substantial, it is not shown to rise to such a level as to render the exercise of jurisdiction over it unconstitutional. New York has a clear interest in adjudicating this dispute involving harm to one of its residents caused, in part, by confusion among New York residents, and it is an efficient forum for resolution of those claims. Plaintiff's principal place of business in New York makes the convenience for it of a New York forum obvious. Finally, defendant has not identified substantive social policies that require a different forum.

Defendant argues that this court should follow *Bensusan Restaurant Corp. v. King,* 937 F.Supp. 295 (S.D.N.Y.1996), where the court found that due process prevented the exercise of jurisdiction over a Missouri resident who owned a club named the Blue Note and posted a page on the Web about the club, and was then sued for trademark infringement by a New York club of the same name. 937 F.Supp. at 300–01. That case was decided on facts far different from those here. In finding that the Missouri resident had not taken any acts purposefully availing itself of New York's laws, the court observed that there was no evidence that he had done any business with New York residents or that either he or his club derived substantial revenue from interstate commerce. 937 F.Supp. at 299–300. Here, in contrast, defendant derives substantial revenue from interstate commerce, it makes clear on its home page (which bears its allegedly infringing mark) that it can serve customers across the United States, and it has done business with New York residents and has sent them software packages and agreements, provided them services, and has received revenue from them.

## II. Transfer

Defendant claims that because its documents, equipment, and employees are located in Georgia, transferring the action there would better serve the convenience of the parties and witnesses and the interests of justice. *See* 28 U.S.C. § 1404(a). However, defendant does not identify, as it must, the witnesses that would be difficult to transport to New York. *See Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir.1978). Its asserted burdens in litigating the action in New York do not appear any more substantial than the burdens plaintiff says it would bear in litigating it in Georgia. Defendant therefore has not met its heavy burden of showing that transfer is warranted. *See United States Barite Corp. v. M.V. Haris,* 534 F.Supp. 328, 330–31 (S.D.N.Y.1982) ("A plaintiff's choice of forum is entitled to great weight and will not be disturbed except upon a clear-cut showing by defendant that convenience and justice for all parties demands that the litigation proceed elsewhere.").

## CONCLUSION

The motions to dismiss or transfer the action are denied.

So ordered.